```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                    NORTHERN DIVISION



CHARLES SMITH, JR.                              PLAINTIFF

VERSUS                          CAUSE NO. 3:19-CV-00826-CWR-LRA

UNKNOWN WASHINGTON                              DEFENDANT




                      OMNIBUS HEARING


          BEFORE THE HONORABLE JUDGE LINDA ANDERSON
              UNITED STATES MAGISTRATE JUDGE
                    JULY 24, 2020
                  JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE PLAINTIFF:  MR CHARLES SMITH, PRO SE

FOR THE DEFENDANT:  KENNETH WALLEY, ESQUIRE





REPORTED BY:

    TAMIKA T. BARTEE, CCR #1782
    OFFICIAL COURT REPORTER
    501 E. Court Street, Suite 2.500
    Jackson, Mississippi  39201
    Telephone:  (601)608-4188
    E-mail:  Tamika_Bartee@mssd.uscourts.gov
```

1          THE COURT:  Is this Mr. Smith?

2          MR. SMITH:  Yes, ma'am.  That's correct.

3          THE COURT:  Okay.  Would you move down to the end of the

4     table, that way we can see each other.

5          MR. SMITH:  Yes, ma'am.

6          THE COURT:  Good morning to you.

7          MR. SMITH:  Good morning to you, too, Your Honor.

8          THE COURT:  Mr. Smith, I am Magistrate Judge Linda

9     Anderson, and you're here for what is called an omnibus hearing.

10    I think we've met before, haven't we?

11         MR. SMITH:  Yes, ma'am.  On several occasions, Your Honor.

12         THE COURT:  Oh, okay.  So you're what we call a frequent

13    flier.  Let's see.  So you know the drill.  We're here for an

14    omnibus hearing; it is not a trial.  You don't need to quote legal

15    authority or anything.  We just need to find out what your

16    complaint is and how to proceed with it.

17         You are familiar with the three strikes law, having been

18    here before.  Is that correct?

19         MR. SMITH:  That's correct, Your Honor.

20         THE COURT:  And the other question is whether or not you

21    and the defendants consent to have me rule on the case or choose

22    to have a district judge.  If you consent, then I will hear the

23    case and rule on it.  If you or the defendants are not satisfied

24    with my ruling, you can appeal it to the Fifth Circuit.  If you

25    prefer to have a district judge rule on it, I'll still conduct the

 1    hearings, then I'll have to write a report and recommendation that

 2    the district judge then will act on, and the remedy is the same.

 3    If you're not satisfied with him, it is the same appeal to the

 4    same court.  So tell me what you choose to do, Mr. Smith.

 5        MR. SMITH:  Well, in this particular case, Your Honor, I

 6    would like to have you as the magistrate judge sit on this

 7    particular case.

 8        THE COURT:  All right.  Let me ask counsel who is

 9    representing the defendants -- and when I look away, I am looking

10    at my computer.  I am trying to pull your case up so I can look at

11    the docket at the same time.  But counsel representing the

12    defendant is present.

13        MR. WALLEY:  Yes, Your Honor.  Ken Walley representing

14    Officer Washington.

15        THE COURT:  All right.  And I believe Officer Washington

16    is the only defendant?

17        MR. WALLEY:  Yes, Your Honor.

18        THE COURT:  All right.  Mr. Walley is here.  As to

19    consent, do you agree or not?

20        MR. WALLEY:  Yes, Your Honor.  We agree to magistrate

21    jurisdiction.

22        THE COURT:  All right.  Then I'll need you to sign the

23    consent form.  And we'll send you a consent form, Mr. Smith.  If

24    you'll sign it and send it back to us right away, we'll go ahead

25    and get you moving in this case.

1        I have received the -- I have read through your complaint.

2        Mr. Smith, will you tell me what happened to you, I

3 believe on October 23, 2019.

4        MR. SMITH:  Yes, ma'am.  Your Honor, on this particular

5 date, I was housed in a maximum security, where I am still housed;

6 but, however, it had become a common practice with the officers

7 whereas they would come in to give showers and conduct showers;

8 and however, most of them would actually open the inmates' doors,

9 illegally, which it is illegal to come into a maximum security

10 unit and open a door without having proper restraints on.

11        On this particular date and time, Mr. Washington, the

12 defendant, he came in to conduct showers.  And however, me and

13 another inmate had already been in verbal altercation for quite

14 some time.  And however, he came and this inmate had chose to go

15 to the shower this particular date.  And instead of

16 Mr. Washington, or Defendant Washington putting or placing the

17 restraints on the individual properly as required by policies and

18 procedures, he just opened the door to allow the inmate to walk to

19 the shower.  Whereas, when he walked to the shower, nothing

20 occurred at that time.  But when he came back to get him out of

21 the shower, never once did he place on the cuffs on him properly

22 and allowed the inmate to walk back and passed my cell while I was

23 standing at the door, and he pressed the window with some type of

24 object that is unknown to me.  But in the course of him busting

25 out the window that I was standing in front of that's inside of

1    the door of the cell, the glass cut me all in the shoulder and my

2    stomach area from this inmate busting the window on his way back

3    to his cell.

4        THE COURT:  What kind of injuries did you receive?

5        MR. SMITH:  I received a lot of cuts on my shoulders --

6    both my shoulders and my stomach area.  And at that particular

7    time, Your Honor, I was denied medical treatment.  Whereas, it

8    took the next shift officers that came in, Officer Rigereth

9    Bolton.  He came in on the next shift and he was escorting the

10   nurse, the medication nurse, around for morning medication.  And

11   once he approached my cell with the nurse, I indicated the

12   situation to them and the nurse saw that I was bleeding and she

13   gave them orders to call to the clinic so that I can be escorted

14   to the clinic for treatment.

15       THE COURT:  And let me make sure I am clear.  You're not

16   really making a claim to the medical.  I understand that is a

17   complaint, but you didn't include it as a claim here.  My

18   understanding your only claim is that this officer breached a

19   policy and allowed the other inmate to injure you.

20       MR. SMITH:  That is correct, Your Honor.

21       THE COURT:  Do you know if the guard was disciplined for

22   breaching the policy?

23       MR. SMITH:  Ma'am, I can't really say because once it was

24   filed into the ARP program, as I had spoken to you before, the ARP

25   process is something that's very confusing because one minute

1  they'll accept claims or officer discipline, and the next minute

2  they'll say that they don't handle it.  So when I filed my ARP, I

3  was requesting monetary damages, as well as this officer to be

4  disciplined.  However, they came back and let me know that this

5  was an issue that they couldn't discipline the officer.  So as far

6  as I am concerned, no, ma'am, not to my personal knowledge whether

7  he was disciplined or even approached about it.

8       THE COURT:  Okay.  I am looking at the docket and a motion

9  was filed on July 14th for summary judgment.  Have you gotten a

10  copy of it yet?

11       MR. SMITH:  No, ma'am, I haven't.  As far as this case is

12  concerned?

13       THE COURT:  Yes.

14       MR. SMITH:  No, ma'am.

15       THE COURT:  You should be getting it soon.  And it charges

16  that you didn't exhaust the administrative remedies.  Did you

17  exhaust?

18       MR. SMITH:  Your Honor, if you will, would you allow me to

19  just say something --

20       THE COURT:  Sure.  Sure.

21       MR. SMITH:  -- as far as this ARP process is concerned.  A

22  while ago in another case where I was before you, I showed you

23  whereas I filed my ARP; you had me to read it to you where it was

24  only talking about me.  But however, they dismissed my ARP saying

25  that I was speaking on behalf of the inmates, which was untrue.

1    But what I am trying to explain to you, ma'am, is that if we file

2    an ARP, we tell them what happened to us, what we went through and

3    the relief that we're seeking.  If I say an officer did something

4    to me, they'll come back and say, "We reject your ARP because we

5    don't discipline officers.  We don't compensate -- this is

6    something that the Courts have to do.  So we don't handle these

7    issues."

8              So what I am saying to you, ma'am, is that I can't appeal

9    that.  So who can I appeal that to if it is rejected?  However, if

10   it is accepted and it goes through the process, the one and two

11   process steps, then I would have the right to appeal.  But how

12   can I appeal something that's been rejected that's never even been

13   through the process?

14         THE COURT:  So your ARP was rejected?

15         MR. SMITH:  The ARP was rejected because it says that the

16   ARP program cannot discipline an officer.  And why would I write

17   an ARP about an officer breaching security and wanting him

18   disciplined, and the ARP says that they don't handle discipline.

19   So that means that the ARP doesn't go anywhere.  So it is just

20   like filing the ARP for no reason at all.  I don't even understand

21   what's the purpose of the ARP because they reject claims that we

22   make and saying that they can't handle it.  It is just like

23   they're saying, We can't pay.  We reject it because we can't give

24   you damages.

25         THE COURT:  Did they just say they couldn't give you that

```
 1   relief, or did they say, "Reject it.  We won't accept it at all"?
 2       MR. SMITH:  They're saying -- they're saying that the ARP
 3   is being rejected simply because they do not discipline officers,
 4   and also because I was asking for compensorital[sic] damages and
 5   this is something that the ARP doesn't do.  This is what it is
 6   actually saying.  Because I rewrote back to the investigator and
 7   she come back with a letter saying -- and I have the letter --
 8   saying that they don't compensate inmates and they don't
 9   discipline officers.  So this is my whole reason for filing the
10   ARP to want officers disciplined, and they reject it.  Where else
11   do I go?
12       THE COURT:  Okay.
13       MR. SMITH:  Because if they accept it, Your Honor, they
14   are going to send it to a first-step responder, whoever that may
15   be.  And once they answer --
16       THE COURT:  Okay.
17       MR. SMITH:  Okay.
18       THE COURT:  Let me ask counsel to help me understand.  It
19   does say -- No. 7 says, "The administrative remedy program cannot
20   accept requests for staff to be disciplined."  And he was supposed
21   to resubmit it.  If that is the claim -- I guess his claim was
22   failure to protect, and failure to protect would be a hard bar for
23   you to meet in this case, unless this officer knew there was
24   something.  He violated policy, but that's not necessarily a
25   constitutional violation.  It was a violation of policy and
```

9

1    procedure.  But it does say that the program cannot accept request

2    for discipline.  I understand that or compensation.

3         So what is he expected to say in the ARP?

4         MR. WILLIAMS:  Unfortunately, we don't have a copy of it

5    in front of us, Judge, but it is kind of scenario based.  He can

6    develop an argument under *Ross v. Blake* that the process is

7    unavailable, depending on the circumstances, which it sounds like

8    what he's trying to do.  But he can ask to not have inmates

9    transported unrestrained in the zone.  It can turn into a word

10   game; but typically, I think the reason that is there is because

11   inmates have something happen, and they want an officer fired or

12   moved or disciplined and they're not in the business of doing

13   that.

14        THE COURT:  And that part makes sense.  I understand that.

15        MR. WILLIAMS:  Right.  And unfortunately, I can't see

16   exactly what he requested as far as his relief.  We don't have it.

17        THE COURT:  And he was injured.  He said that he asked for

18   monetary compensation.  This says that you can't ask for

19   compensation.

20        MR. WILLIAMS:  That's correct.  They don't pay monetary

21   damages either.

22        THE COURT:  So what in this instance -- they said he can

23   resubmit.  What would he --

24        MR. WILLIAMS:  Ask not to have inmates transported.  It

25   sounded like the zone he described, everyone should have been in

1   restraints if they're being moved.  You'd ask to not allow inmates

2   to be transported without being retrained.  It is not a lack of

3   medical care here.  It doesn't sound like -- I haven't seen that

4   pop up.  But something could arise regarding medical treatment he

5   received.

6        THE COURT:  And he sought compensation, $50,000, for the

7   injuries caused by the officers' deliberate actions.  If he was

8   injured, could he not request compensation?

9        MR. WILLIAMS:  I don't believe so, Your Honor.  I am not

10  aware of them paying any monetary damages through the ARP process.

11       THE COURT:  Yeah, we've seen them accepted.  We're going

12  to look at it closely to see.

13       MR. WILLIAMS:  I think he made a fairly persuasive

14  argument under *Ross v. Blake* that that particular one was

15  unavailable.

16       THE COURT:  And they weren't going to fire him, but you

17  have to do it and this is what happened.  You do have some hurdles

18  to get over, because this failing to restrain him is a policy

19  violation, not necessarily a constitutional violation.  In arguing

20  that you are not protected, he had no prior knowledge of any

21  potential attack he did violate.  We'll see where it goes, but I

22  am interested in knowing a little bit more about the process and

23  what would be expected.

24       And counsel just gave you a good hint there.  What was the

25  case you referred him to?

1          MR. WILLIAMS:  *Ross v. Blake,* Your Honor.

2          MR. SMITH:  But, Your Honor, what I was saying to you was

3     that when you were speaking about the constitutional violation,

4     this is not a one-time thing.  This is a repeated thing where

5     these individuals deliberately do this.  They come in on maximum

6     security unit and do this.  This is something that they know they

7     should do.  It is obvious.  These people have been here for years.

8     They know that we don't want open maximum security doors, period,

9     without individual inmates being restained.  And once I filed this

10    claim, now they don't do it.

11         THE COURT:  So this stopped the practice, then?

12         MR. SMITH:  Exactly.  But what I am telling you is, this

13    has been going on for years.  It's been going on for years.  The

14    officers feel like, Okay.  We run this thing.  We are not worried

15    about this or not.  They're going to obey us.  Even though we're

16    doing wrong, they're going to obey us and go where we tell them to

17    go and go back in their cells the way we took them out.  This is

18    the way that they think.  This is the way they think.  And until I

19    filed this case, then it stopped.

20         THE COURT:  Okay.  My next question -- and I am wondering,

21    does this same officer still come on the zone and do this?

22         MR. SMITH:  Well, at the time that this occurred, we had

23    been moved to Section 5; but, yes, to my knowledge, he still does

24    showers.  Now whether he does them and let people out, he doesn't

25    come down to Section 6 where I am housed at and do it.  He doesn't

1    do it there around me anymore.

2         THE COURT:  All right.  Do you have any reason to believe

3    that when he did it, he did it knowing or believing that you would

4    be hurt, other than the general, this could happen?

5         MR. SMITH:  That's like a trick question.  That would be

6    hard for me because I just look at the fact of them knowing what

7    the policy consists of and knowing what they are supposed to do.

8    And I believe that when you have a unit where dangerous

9    prisoners -- and we're classified as dangerous prisoners.  So to

10   know this and to put restraints on it and then not to do it, then

11   I am believing within myself, Your Honor, that they know any time

12   that they open that door, not only are they placing my life in

13   danger, they are placing theirs in danger, too.

14        THE COURT:  The possibility.  And one of the things that

15   your case is going to go to is whether or not he deliberately

16   targeted some act toward you, or whether he was just generally

17   negligent in failing to do it.  Now, it would make a difference if

18   he allowed this inmate out specifically with the intent to have

19   something done to you.  Do you have any reason to believe that

20   that was the case?

21        MR. SMITH:  I believe -- honestly, ma'am, to answer that

22   question, yes.  I am going to have to say, yes.  I am going to say

23   yes.

24        THE COURT:  Okay.  Any evidence to back that up?

25        MR. SMITH:  The only evidence that I can prove that that

1   was done is by the camera.  That's the only evidence that I can

2   prove.  But mentally, no, I can't.

3           THE COURT:  And you had some cuts and bruises.  How long

4   were you -- not ill, but how long did you suffer from the

5   injuries?

6           MR. SMITH:  Like a few days.  I mean, you know, like

7   maybe -- well, I was being treated.  They gave me -- I went to the

8   clinic and they gave me ointment and different bandages and stuff

9   to put on the cuts.  So I treated those for about like three or

10  four days, the bandages and the stuff that they gave me.

11          THE COURT:  Sounds like you've accomplished something and

12  that the practice is no longer being done that way.

13          MR. SMITH:  Yes, ma'am, at the moment.  When this all

14  disappears, I don't know what will happen after that.  I can't

15  speak about that.

16          THE COURT:  All right.  Thank you, Mr. Smith, you've been

17  very helpful.

18          Let me ask you, counsel, if you have any questions for

19  Mr. Smith.

20          MR. WALLEY:  No, Your Honor.  I believe you've covered

21  everything.

22          THE COURT:  All right.  Mr. Smith, do you have any

23  questions?

24          MR. SMITH:  None other than this summary judgment that you

25  were speaking about, I never received.

```
 1            THE COURT:  All right.  If you don't get that in the next
 2    week, because this says this was sent on July 14th --
 3            MR. SMITH:  I am going to say this, Your Honor, also about
 4    this mail thing.  Since this coronavirus, the people that normally
 5    work in the legal area and bring our mail to us, they don't come
 6    around every day like they normally would do before this
 7    coronavirus came.  So these people are waiting for one time out of
 8    a week to bring us our mail, and once we open up the mail, you may
 9    have given us the order, and we might not have but one day to meet
10    our deadline because of what they're doing.
11            THE COURT:  Everything is upsidedown with the virus and I
12    understand that's why you're here by video instead.  So if you
13    don't get it in the next week, write us and let us know so that it
14    can be resent to you.  And I will extend the days for your
15    responses.  If you're late getting it, we're certainly going to
16    accept it after you've had a reasonable time to do it.  We're
17    going to grant you that.  Witness and exhibit list, you can mail
18    it to us.
19            Counsel?
20            MR. WALLEY:  Yes, Your Honor.  We have a witness and
21    exhibit list that we'll be mailing to Mr. Smith today, and
22    included with that, we'll send him another copy of the motion for
23    summary judgment.
24            THE COURT:  Okay.  Great.  I think this concludes this
25    motion.  I think you'll be hearing from the Court as far as what
```

1   direction we'll take next.  Thank you to everybody and I believe

2   that concludes all of our matters.

3           MR. SMITH:  Thank you, Your Honor.

4           THE COURT:  Thank you, Mr. Smith.  Good luck to you.

5           MR. SMITH:  Thank you.  Have a nice day.

6           (Off the record at 11:54 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COURT REPORTER'S CERTIFICATE

     I, Tamika T. Bartee, Certified Court Reporter, in and for the State of Mississippi, Official Court Reporter for the United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

     I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

     THIS the 11th day of August, 2020.

*/s/ Tamika T. Bartee, CCR*

Tamika T. Bartee, CCR #1782
Official Court Reporter
United States District Court
Tamika_Bartee@mssd.uscourts.gov